IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEMUEL FRED HENTZ,

             Plaintiff,

    v.

PAM J. CENIGA et al.,

             Defendants.

No. CV 08-157-MO

OPINION AND ORDER

**MOSMAN, J.,**

      Lemuel Fred Hentz brought suit against Pam J. Ceniga, Cherie R. Jackson, Darla L.

Davis, J. Cappi[1], Joan Davies, S. Franke, J. Blackburn, and J. Roe, employees of the Oregon

Department of Corrections (collectively "Oregon Department of Corrections" or "ODOC"), under

42 U.S.C. § 1983 alleging violations of his First, Fourth, Fifth, Eighth, and Fourteenth

Amendment rights.  (Compl. (#2) ¶ 1.)  Specifically, Mr. Hentz alleges that the defendants: (1)

confiscated money from his prisoner trust account (*id.* ¶¶ 6.A.1-2, 5); (2) failed to serve him with

a copy of a Misconduct Report within twenty-four hours of its being filed, which resulted in him

being unable to call a witness at his disciplinary hearing (*id.* ¶¶ 6.A.3-5); (3) gave him an upward

deviation sanction without substantial written reasons (*id.* ¶ 6.A.7); (4) failed to properly

inventory his personal property resulting in the loss of many photographs (*id.* ¶ 6.A.8); (4)

---

      [1] This defendant is actually named Joe Capps.  (Davies Aff. (#28) ¶ 4.)

PAGE 1 - OPINION AND ORDER

confiscated two books and several black ink pens (*id.* ¶ 6.A.9); and (5) retaliated against him for using the grievance process (*id.* ¶ 6.A.11).

The matters now before the court are Mr. Hentz's Motion for Summary Judgment (#9) and the defendants' Cross-Motion for Summary Judgment (#23). Mr. Hentz has not demonstrated that there were any clear constitutional violations, therefore defendants are entitled to qualified immunity. Mr. Hentz's Motion for Summary Judgment (#9) is therefore DENIED and the defendants' Cross-Motion for Summary Judgment (#23) is GRANTED.

## BACKGROUND

Mr. Hentz is currently incarcerated at the Eastern Oregon Correctional Institution ("EOCI"). (Compl. (#2) ¶ 3.3.) He was previously housed at Snake River Correctional Institution ("SRCI"). (Davies Aff. (#28) ¶ 3.)

In a previous incident, Mr. Hentz and an inmate named Ryan Williams were found guilty of racketeering. (Davies Aff. (#28) ¶ 4, Attach. 2 at 15-16,18, 20-21.) Inmate Williams had requested that his mother send $1,500 to Mr. Hentz to pay off a gambling debt. (*Id.* Attach. 2 at 7-8.) Inmate Williams told his mother that he had owed Mr. Hentz $2,000, but had worked it down to $1,500. (*Id.*) Mr. Hentz was fined $200 for the racketeering violation. (*Id.*)

On June 5, 2006, inmate Ryan Williams made a withdrawal of $2,200 from his Washington Mutual bank account. (*Id.* Attach. 2 at 22.) Three days later, on June 8, $2,200 was deposited in Mr. Hentz's inmate trust account from the Washington Mutual account of a Ryan Williams. (Compl. (#2) ¶ 4.12, Ex. 1-2.) On July 7, 2006, defendant Pam Ceniga requested that defendants Cherie Jackson and Darla Davis put a freeze on Mr. Hentz's trust account pending an extortion/racketeering investigation. (Compl. (#2) ¶ 4.14, Ex. 3; *see also* Davies Aff. (#28)

PAGE 2 - OPINION AND ORDER

Attach. 3 at 2.)  Because of the freeze Mr. Hentz was not able to access the funds in the account. (Compl. (#2) ¶ 4.15.)

Mr. Hentz alleges that also on July 7, 2006, his personal property was confiscated and searched by SRCI staff, leading to the discovery of a letter from a Ryan Williams indicating that he had sent Mr. Hentz some money and would be available until August 30, 2006.  (*Id.* ¶ 4.16, Ex. 4.)  Mr. Hentz offers no evidence of this search or evidence that the letter was either seen or read by defendants before August 30.  He does cite a "Shakedown Report" that mentions the discovery of letters dated July 7, 2006, attached to the Davies Affidavit.  (Pl.'s Mem. in Opp. (#41) 5.)  However that report was related to a search of inmate Ryan Williams's cell, not that of Mr. Hentz.  (Davies Aff. (#28) Attach. 2 at 23.)  Defendants do not mention a search of Mr. Hentz's personal belongings on July 7, 2006, or knowledge of the existence or contents of the letter.  A copy of the letter is included in Mr. Hentz's misconduct file, apparently at Mr. Hentz's request as defendants indicate that they first heard about the second Ryan Williams at the September 8 hearing.  (*See* Davies Aff. (#28) ¶ 6, Attach. 2 at 4, 38.)

Inspector Ron Rouse conducted an investigation of the suspected racketeering and issued a misconduct report on August 28, 2006, signed by defendant Joe Capps.  (*Id.* ¶ 4, Attach. 2 at 7.)  The misconduct report and notice of hearing/inmate rights was served on Mr. Hentz on September 6, 2006.  (Compl. (#2) ¶ 4.18; Davies Aff. (#28) ¶ 4, Attach. 2 at 7.)  The disciplinary hearing was held on September 8 before defendant Hearing Officer Joan Davies.  (Compl. (#2) ¶ 4.20.)  Mr. Hentz requested an investigation, a copy of the check, and witnesses inmate Ryan Williams and civilian Ryan Williams.  (*Id.*)  He also indicated that civilian Ryan Williams was

PAGE 3 - OPINION AND ORDER

now in Alaska and entered a plea of "Deny." (Davies Aff. (#28) ¶¶ 5-6.) The hearing was suspended until September 21, 2006, to allow for the requested investigation. (*Id.* ¶ 6.)

It is unclear whether any further investigation was actually completed. Hearing Officer Davies indicates that she received the findings from the investigation on September 21 (*id.* ¶ 7), however, Investigator Frank Sorrano told Mr. Hentz that no investigation was conducted (Pl.'s Aff. in Reply (#42) Ex. 1). Hearing Officer Davies made the following Ultimate Findings of Fact and Conclusions at the September 21 hearing: "Inmate benefited from, engaged in, or conducted an operation to make money illegitimately or to deprive another person or business of money, property or service(s), thereby violating Rule 4k, Racketeering." (Davies Aff. (#28) ¶ 7, Attach. 2 at 2.) As a result, Mr. Hentz received the following sanctions: 180 days of segregation ("DSU"), twenty-eight days loss of privileges suspended, seven days segregation suspended based on no major rule violations, a fine of $200, and a time retraction of 200 days earned time. (*Id.* ¶ 8, Attach. 2 at 2-3.) Defendant S. Franke signed off on the disciplinary sanctions. (Compl. (#2) ¶ 4.23.) Mr. Hentz indicates that they also confiscated the $2,200 from his inmate trust account as contraband. (*Id.* ¶ 4.22.) Mr. Hentz further contends that 180 days of solitary is an upward deviation from the standard 120 day sanction for racketeering, as demonstrated by the Major Violation Grid Inmates Misconduct History Scale. (*Id.* ¶¶ 4.22-23, Ex. 8.)

Mr. Hentz was transferred from SRCI to EOCI on October 25 or 26, 2006, and housed in segregation. (Roe Aff. (#29) ¶ 4, Attach. 2 at 3; Compl. (#2) ¶¶ 4.25-26.) Apparently as a part of this transfer, Mr. Hentz's belongings were inventoried at SRCI and again at EOCI. (Compl. (#2) ¶¶ 4.25-26.) Mr. Hentz alleges that defendant Officer J. Blackburn failed to compare his inventory taken at EOCI to the inventory taken at SRCI and note any discrepancies. (*Id.* ¶¶ 4.25-

PAGE 4 - OPINION AND ORDER

26.)  Mr. Hentz was released from segregation on March 5, 2007, and given his personal

property.  (*Id.* ¶ 4.27.)  He contends that 287 of the 438 photographs inventoried at SRCI were

missing, 105 of which he states had historical value, none of which can be replaced.  (*Id.* ¶¶ 4.25,

4.27-28.)  ODOC reports that Mr. Hentz did not file any grievances regarding the loss of the

photographs.  (Maine Aff. (#27) ¶¶ 4, 11.)  Mr. Hentz indicates that he did file a grievance but

that it was rejected as untimely.  (Pl.'s Mem. in Opp. (#41) 12.)  He then filed a tort claim in

Oregon state court and was offered $430.50, which he rejected.  (*Id.*, *see also* Hentz Aff. in

Reply (#42) Ex 7.)

A few weeks later, on March 30, 2007, defendant Officer Jerry Roe learned from a

member of the EOCI staff that Mr. Hentz was in possession of black pens in violation of EOCI

rules.  (Roe Aff. (#29) ¶ 7, Attach. 3 at 2.)  Officer Roe asked Mr. Hentz about the pens, who

then handed over ten black ink pens, seven purchased from the canteen before black ink pens

were banned and three issued in segregation that were supposed to be left with DSU staff.  (*Id.*;

*see also* Compl. (#2) ¶ 4.29.)  Officer Roe then issued a Misconduct Report for #1C Property II

and #1E Contraband II on April 2, 2007.  (Roe Aff. (#29) ¶ 7.)  The Misconduct Report and

Notice of Hearing/Inmate Rights and Rules of Prohibited Conduct were served on Mr. Hentz that

same day.  (Sturdevant Aff. (#26) ¶ 4, Attach. 2 at 4.)

On April 4, 2007, Hearing Officer Sturdevant opened the Misconduct Hearing for #1C

Property II and #1E Contraband II.  (*Id.* ¶ 5, Attach. 2 at 2.)  Mr. Hentz did not request witnesses

and pled "Deny" on both counts.  (*Id.*)  Hearing Officer Sturdevant made the following Ultimate

Findings of Fact and Conclusions: "Inmate Hentz possessed contraband which creates a threat to

the safety, security or orderly operation of the facility thereby, violating rule 1e(A), Contraband

PAGE 5 - OPINION AND ORDER

II.  The Hearing Officer finds no violation for Rule 1c, Property II."  (*Id.*)  Mr. Hentz received a

sentence of fourteen days loss of privileges.  (*Id.*)

      The following month, Officer Roe learned from the same EOCI staff member that Mr.

Hentz had carbon paper, a banned item.  (Roe Aff. (#29) ¶ 9.)  Officer Roe searched Mr. Hentz's

cell on May 1, 2007, and found "self help legal books, six black ink pens, an ID bracelet with

Hentz's picture from Multnomah Co. jail, 3 sets of headphones (two of which were ear buds),

two rubber bands, an Aiwa radio, two sheets of carbon paper, several loose magazine photos of

nude women, foam ear pads for headphones, Sony radio model TRH-2 with an altered SID #,

two pairs of splitters, an empty coffee container, and a metal paperclip."  (*Id.*)  Mr. Hentz alleges

that Officer Roe planted the following contraband in his living area:  "One nude photo showing

Sexual Penetration; 10 to 14 inches of Scoth [sic] Tape, Seven Black Ink Pen's [sic] and a large

Metal Paper clip."  (Compl. (#2) ¶ 4.33.)  Officer Roe wrote and signed a Misconduct Report for

#1B Property I, #1E Contraband II, #4a Disobedience I, and #4b Disobedience II, on May 2,

2007, and it was served on Mr. Hentz the same day.  (Roe Aff. (#29) ¶ 9, Attach. 3 at 9; *see also*

Sturdevant Aff. (#26) ¶ 8, Attach. 2 at 9.)

      A Misconduct Hearing was held before Hearing Officer Sturdevant on May 7, 2007.

(Sturdevant Aff. (#26) ¶ 9, Attach. 2 at 7; *see also* Compl. (#2) ¶ 4.34.)  Mr. Hentz entered a plea

of "Deny" to all counts of misconduct and his request for an investigation was denied because the

charges were dismissed without prejudice.  (Sturdevant Aff. (#26) ¶ 9, Attach. 2 at 7.)  Hearing

Officer Sturdevant dismissed the charges because some items of alleged contraband that Officer

Roe confiscated were not mentioned in the Misconduct Report and ordered further investigation

because Mr. Hentz argued that the splitters were purchased at the SRCI canteen and the damaged

PAGE 6 - OPINION AND ORDER

legal books were purchased at SRCI through a Red Cross fundraiser.  (*Id.* ¶ 10, Attach. 2 at 7.)
Mr. Hentz indicates that he then filed a grievance against Officer Roe regarding the alleged
planting of evidence.  (Compl. (#2) ¶ 4.34.)  The grievance is not included as an exhibit and it
not mentioned by the defendants.

On May 8, Officer Roe re-wrote and signed a Misconduct Report properly itemizing the
articles confiscated from Mr. Hentz's cell, which was delivered to Mr. Hentz the same day.  (Roe
Aff. (#29) ¶ 11, Attach. 3 at 12; Sturdevant Aff. (#26) ¶ 11, Attach. 2 at 14.)  A second
disciplinary hearing was held before Hearing Officer Sturdevant on May 14 at which Mr. Hentz
pled "Deny" on all counts.  (Sturdevant Aff. (#26) ¶ 12, Attach. 2 at 10.)  Mr. Hentz's request for
a witness was denied because the witness's testimony would not have constituted a defense.  (*Id.*)
Hearing Officer Sturdevant found a violation of Rule 1e(A), Contraband II, for possession of
contraband which creates a threat to the safety, security or orderly operation of the facility.  (*Id.* ¶
13, Attach. 2 at 10-11.)  He further found that the charge of Rule 1b, Property I, was not
supported by the facts but found Mr. Hentz guilty of the lesser included minor rule violation of
Rule 1c, Property II, for "destroying, abusing, altering, damaging, defacing, misusing, tampering
with, or wasting materials or property, or failing to properly protect or produce property issued to
him/her in a timely manner."  (*Id.*)  He found no violation of Rule 4a, Disobedience of an Order
I.  (*Id.*)  Mr. Hentz received a sentence of fourteen days loss of privileges, seven days suspended
segregation sanction pending no major rule violations, and was directed to mail out the two legal
books and produce receipts for the splitters.  (*Id.* ¶ 14, Attach. 2 at 11.)  Mr. Hentz states that he
was also prevented from getting a job for ninety days due to bad conduct.  (Compl. (#2) ¶ 4.36.)

Mr. Hentz alleges that Officer Roe planted the seven black ink pens in his cell to use as evidence in the second hearing as retaliation for Mr. Hentz filing a grievance against Officer Roe on May 7. (*Id.* ¶ 4.37.) As evidence, Mr. Hentz indicates that the May 1 misconduct report did not mention the pens, which were listed on the May 8 report. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). For cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quoting *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003)).

If the movant initially shows that no genuine issue exists for trial, the non-movant cannot then rest on the pleadings but must respond with evidence setting "forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party has the "burden of advertising [sic] to 'specific facts showing that there is a genuine issue for trial.' . . . It is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N. R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).

## DISCUSSION

### I.    <u>Qualified Immunity</u>

In 42 U.S.C. § 1983, Congress created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Castle Rock v. Gonzales,* 545 U.S. 748, 755 (2005) (internal citation omitted).  Thus, a plaintiff who asserts a section 1983 claim must establish: "(1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. County of Los Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006) (internal citation omitted).

Individual government officials named as defendants in section 1983 cases may assert a qualified immunity defense.  Allowing damages suits against government officials for actions taken in the course of carrying out their duties can carry "substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  However, actions for damages may be the only way to protect constitutional guarantees against government officials who abuse their offices.  *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  To balance these conflicting concerns, courts have provided "government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Id.* (citations omitted).  In other words, "[t]he contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640.

Under this standard, there is no need to determine whether an official is entitled to qualified immunity if no constitutional right has been violated. Thus, in *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims. First, a court must determine whether the plaintiff has alleged sufficient facts to make out a violation of a constitutional right. *Id.* at 201. Second, if the plaintiff has satisfied the first step, the court must decide whether the constitutional right was clearly established when the defendant committed the misconduct. *Id.* Recently, the Court has held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). In so holding, the Court noted that there are situations in which it is difficult to determine whether there was a constitutional violation and ultimately unnecessary because the defendant would benefit from qualified immunity anyway. *See id.* at 817-18 (citing several lower court cases that have criticized the *Saucier* rule). However, in other cases, "a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Id.* at 818. In such a case, the *Saucier* rule would be the most efficient method of deciding the case.

As demonstrated below, the facts of this case do not make out any constitutional violations on the part of the defendants. Therefore, I will follow the *Saucier* two-step sequence for resolving the defendants' qualified immunity claims.

## II.    None of the Facts Alleged Make Out Claims Under Equal Protection or the Eighth Amendment

### A.    *There are no equal protection violations*

Mr. Hentz alleges violations of his right to equal protection in each of his claims. (Compl. (#2) ¶¶ 5.38-43, 6.A.1-11.)  All of these equal protection claims fail because Mr. Hentz does not allege that he was a member of a protected class, *Barren v. Harrington*, 152 F.3d 1193, 1194-95 (9th Cir. 1998) (citations omitted), or that he was treated differently than others who are similarly situated, *see City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (citations omitted).  "It is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar*, 29 F.3d at 504 (quoting *Celotex Corp.*, 477 U.S. at 324).  Therefore, I grant summary judgment to defendants on all equal protection claims.

### B.    *There are no Eighth Amendment violations*

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." *Morgan* v. *Morgensen,* 465 F.3d 1041,1045 (9th Cir. 2006).  A prisoner claiming an Eighth Amendment violation must demonstrate: "(1) that the deprivation he suffered was objectively, sufficiently serious; and (2) that prison officials were deliberately indifferent to his safety in allowing the deprivation to take place." *Id.* at 1045 (citing *Farmer* v. *Brennan,* 511 U.S. 825, 834 (1994)) (internal citations omitted).

The Eighth Amendment is mentioned only twice in Mr. Hentz's briefings regarding summary judgment and then only in a list of all rights that were allegedly violated.  (Pl.'s Mem.

in Supp. of Summ. J. (#11) 2; Pl.'s Mem. in Opp. (#41) 1.)  He provides no arguments regarding

what actions constituted cruel and unusual punishment within the meaning of the Eighth

Amendment.  No actions described by Mr. Hentz are objectively serious enough to be cruel or

unusual.  Therefore, I grant summary judgment to defendants as to the Eighth Amendment

claims.

### III.    <u>Freezing $2,200 in Inmate Trust Account, Disciplinary Hearing, & Punishment</u>

Mr. Hentz makes the following claims for relief with respect to the freezing of the $2,200

in his inmate trust account and the ensuing misconduct report, disciplinary hearing, and

punishment: (1) defendants Ceniga, Jackson, and Davis violated his Fourth, Fifth, and Fourteenth

Amendment rights by freezing his inmate trust account,[2] (Compl. (#2) ¶¶ 6.A.1-2); (2) defendant

Capps violated his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights by failing to

serve Mr. Hentz with the misconduct report within twenty-four hours, (*id.* ¶ 6.A.3); (3) defendant

Davies violated his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights by not

conducting an investigation, not allowing Mr. Hentz to call a witness in his disciplinary hearing,

and sentencing Mr. Hentz to an upward deviation sanction without substantial written reasons,

(*id.* ¶¶ 6.A.4-7); and (4) defendant Franke violated his First, Fourth, Fifth, Eighth, and Fourteenth

Amendment rights by failing to overturn the racketeering sanction despite the above violations

(*id.* ¶ 6.A.7).

//

//

---

[2] In an earlier part of the Complaint Mr. Hentz also contends that these defendants violated his First Amendment rights with his action.  (Compl. (#2) ¶ 5.38.)

A.    *There are no First Amendment violations*

Mr. Hentz has not specified what actions taken by the relevant defendants infringed upon his rights under the First Amendment.  In fact, the First Amendment is not mentioned in any of his briefing on the question of summary judgment except when he is listing his claims.  (*See* Pl.'s Mem. in Opp. (#41) 1.)  There is no indication that any of the defendants took any action that infringed upon Mr. Hentz's freedom of speech or punished him for expressing any particular ideas.  Therefore, I grant summary judgment to defendants as to the First Amendment claims.

B.    *There are no due process violations*

1.    **Mr. Hentz has a property interest but no liberty interest protected by due process**

A claim for a violation of procedural due process requires both a deprivation of a liberty or property interest and the denial of adequate procedural protections.  *Hufford* v. *McEnaney,* 249 F.3d 1142, 1150 (9th Cir. 2001).  A prisoner has a protected property interest in the funds in his prison trust account.  *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1985).  Thus, Mr. Hentz had a property interest in the $2,200 in his trust account and defendants were required to provide procedural due process before permanently depriving him of his property.

Mr. Hentz also argued that his sanction of 180 days in segregation was improper because it was an upward deviation from the standard 120 days and defendants did not provide substantial written reasons for the deviation.  Whatever the standard punishment, Mr. Hentz only has a constitutional due process claim if he has a protected liberty interest in the sixty day difference between the 120 and 180 day sanction.  A prisoner's liberty interest is "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

There is "no single standard" to determine whether a prison hardship is atypical and significant;

courts employ a "case by case, fact by fact consideration." *Ramirez v. Galaza*, 334 F.3d 850, 861

(9th Cir. 2003) (quoting *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996)).

     However, the Supreme Court has stated that thirty-days in "segregated confinement

[does] not present the type of atypical, significant deprivation in which a State might conceivably

create a liberty interest." *Sandin*, 515 U.S. at 486. Cases since *Sandin* have extended this rule

considerably. *See, e.g.*, *Beverati v. Smith*, 120 F.3d 500, 503-04 (6th Cir. 1997) (holding that six-

months of administrative confinement did not create a liberty interest and collecting similar

circuit court cases); *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (stating that a prisoner

has no protected liberty interest in being free from segregation because the Ninth Circuit has

explicitly found "that administrative segregation falls within the terms of confinement ordinarily

contemplated by a sentence" (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1091-92 (9th Cir.

1986))). Thus, Mr. Hentz has no protected liberty interest in the sixty day difference between the

120 and 180 day sanction.

       **2.    Defendants complied with the requirements of due process**

        a)    No process was required before freezing the funds

     To the extent that Mr. Hentz is arguing that a hearing was required before the defendants

froze the money in his trust account, summary judgment is granted to defendants. Pre-

deprivation process is not required for the seizure of suspected contraband or the fruits of a

crime. *See generally* Fed. R. Crim. P. 41(c)(2), 41(g) (the solution for improper seizure is a post-

deprivation motion). To hold otherwise would require notice to the property owner and a hearing before a search warrant is executed.

> b) The disciplinary hearing met the requirements of post-seizure due process

A prison disciplinary hearing comports with due process when an inmate receives: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The notice of the charges must be given at least twenty-four hours before the hearing to give the inmate time to prepare. *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994) (citations omitted) *overruled on other grounds by Sandin*, 515 U.S. 472. Additionally, the findings of the disciplinary board must be "supported by some evidence in the record." *Hill*, 472 U.S. at 454. Under the "some evidence" standard, the relevant inquiry is whether there is any evidence in the record that could support the prison's conclusion. *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) (quoting *Hill*, 472 U.S. at 455-56). Mr. Hentz's disciplinary hearing regarding the $2,200 met these requirements.

On September 6, 2006, the misconduct report and notice of hearing/inmate rights were served on Mr. Hentz, giving him notice of the disciplinary charges.[3] (Compl. (#2) ¶ 4.18; Davies

---

[3] The fact that the ODOC rules require service to be within twenty-four hours of the signing of the misconduct report does not alter the constitutional analysis. As long as a disciplinary hearing comports with the requirements of *Wolff*, a prison does not violate due process by failing to follow its own procedures that "rise above the floor set by the due process clause." *Walker*, 14 F.3d at 1420 (quoting *Rogers v. Okin*, 738 F.2d 1, 8 (1st Cir. 1984)).

Aff. (#28) ¶ 4, Attach. 2 at 7.)  The hearing began on September 8, (Compl. (#2) ¶ 4.20), and was

continued to September 21, (Davies Aff. (#28) ¶6), allowing Mr. Hentz well over twenty-four

hours to prepare.

Hearing Officer Davies provided a written statement summarizing her conclusions and

the evidence relied upon in reaching those conclusions.  (Davies Aff. (#28) Attach. 2 at 2-3.)  Her

conclusions were based on evidence in the record, including evidence of the withdrawal from

inmate Williams's bank account, the check deposited in Mr. Hentz's bank account, and

information relating to the previous racketeering sanction.  (*Id.*)  This is sufficient to meet the

"some evidence" standard mandated by *Hill*, 472 U.S. at 454.

Mr. Hentz contends that he was unable to call a witness because the defendants purposely

delayed serving him with the notice of the disciplinary charges and holding the hearing until after

the civilian Ryan Williams had left the state.  (Compl. (#2) ¶ 4.19.)  This argument rests upon the

following allegations.  First, that a civilian named Ryan Williams just happened to deposit

$2,200 in Mr. Hentz's bank account a few days after an inmate with the same name (who owed

Mr. Hentz $2,200) withdrew $2,200 from his own bank account.  Second, that both Ryan

Williams's bank at Washington Mutual.  Third, that defendants searched Mr. Hentz's cell on July

7, 2006, found the letter from "Ryan Williams," and read it.  Fourth, that after reading the letter,

defendants decided to conspire to confiscate Mr. Hentz's $2,200 so that they could deposit the

money in the Inmate Welfare Account.  (*See* Davies Aff. (#28) Attach. 3 at 9.)  And fifth, that the

civilian Ryan Williams left the state only two days after Mr. Hentz was served with the

misconduct report and has apparently remained unavailable throughout the briefing for this case,

as he has not submitted an affidavit in support of Mr. Hentz's motion for summary judgment.

The defendants have not directly addressed this argument, focusing in stead on the fact that failing to serve the notice of misconduct within twenty-four hours is not itself a constitutional violation.  (Defs.' Mem.in Supp. of Summ. J. (#24) 6.)  This argument, misses the point; Mr. Hentz is arguing that the defendants intentionally deprived of the ability to call a witness, a right that is constitutionally protected.

However, summary judgment for defendants is still appropriate on this claim because "the factual context renders [plaintiff's] claim implausible."  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587 (holding that when the factual context surrounding a claim makes it implausible, the party making the claim "must come forward with more persuasive evidence to support their claim than would otherwise be necessary").  Mr. Hentz has not met this burden.  The likelihood that there are two Ryan Williams's connected to Mr. Hentz, who bank at the same bank, and withdrew the same amount of money at the same time, seems almost impossibly remote.  Also, there is no objective evidence supporting Mr. Hentz's allegations.  The "Shakedown Report" cited by Mr. Hentz as evidence that the defendants knew of the letter sent by Ryan Williams, relates to a search of inmate Ryan Williams's cell, not the cell of Mr. Hentz.  (Pl.'s Mem. in Opp. (#41) 5 (citing Davies Aff. (#28) Attach. 2 at 23).)  Thus, there is no evidence that defendants searched Mr. Hentz's cell before the September 8 hearing when he told them about the other Ryan Williams.  Although the letter from the other Ryan Williams appears in Mr. Hentz's misconduct file, nothing indicates when it was placed in the file.

Finally, if the ODOC were conspiring to confiscate Mr. Hentz's money for the Inmate Welfare Account, itself an extremely unlikely circumstance, they would not need to prevent the other Ryan Williams from testifying to accomplish their goal.  Under the "some evidence"

PAGE 17 - OPINION AND ORDER

standard, prison officials only need to demonstrate that there exists evidence in the record that

supports their findings. *See Bruce*, 351 F.3d at 1287 (quoting *Hill*, 472 U.S. at 455-56). Thus,

even if the other Ryan Williams had testified that he gave Mr. Hentz the money, ODOC could

have still confiscated the money by stating that there was other evidence in the record showing

that inmate Ryan Williams gave Mr. Hentz the money. Mr. Hentz has not provided sufficient

persuasive evidence to overcome the implausibility of his claims, therefore, I grant summary

judgment to defendants on these claims.

### C.    *There are no Fourth Amendment violations*

Mr. Hentz appears to limit his Fourth Amendment arguments to the contention that the

freezing of the $2,200 in his inmate trust account was an unconstitutional seizure. (*See* Pl.'s

Mem. in Supp. of Summ. J. (#11) 3-4.) To the extent that he makes a Fourth Amendment claim

regarding the ultimate confiscation of the money following the disciplinary hearing, summary

judgment is granted to defendants on those claims. "The Department of Corrections may assess

an inmate's trust account for sanctions resulting from the inmate's disciplinary hearings." Or.

Admin. R. 291-158-0015(1). Furthermore, the confiscation of items that are proven to be

contraband is clearly within the power of the ODOC. As noted above, the ODOC held a hearing

in which it properly determined that the $2,200 was contraband and also assessed a $200 fine for

misconduct. Therefore, the permanent seizure following the disciplinary hearing was not

unreasonable under the Fourth Amendment.

As to the temporary freeze put on the $2,200 believed to have been deposited in Mr.

Hentz's inmate trust account by inmate Ryan Williams, such an action would generally be a

seizure within the meaning of the Fourth Amendment. *See United States v. Jacobsen*, 466 U.S.

PAGE 18 - OPINION AND ORDER

109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property."); *see also Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 585 F. Supp. 2d 1233, 1262-63 (D. Or. 2008) (holding that the freezing of executive assets was a seizure within the meaning of the Fourth Amendment but not reaching the question of whether it was unreasonable).  However, the seizure in this case was constitutionally permissible.

First, the Supreme Court has held that "the Fourth Amendment has no applicability to a prison cell." *Hudson v. Palmer*, 468 U.S. 517, 536 (1984).  In *Hudson*, the Court noted that "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.* at 528 n.8.  This reasoning applies by analogy to money in prisoner trust accounts used to purchase items or as payment for services that "disserve legitimate institutional interests."  Here, the money was only temporarily "frozen" before it was properly determined to be contraband—i.e., payment for racketeering—and then lawfully confiscated.  In such a case, it makes sense to treat the seizure like one in a prison cell, to which the Fourth Amendment gives no protection.

Second, a warrantless seizure of assets is allowed when the seizing authority has probable cause.  *See, e.g.*, *Colello v. SEC*, 908 F. Supp. 738, 753 (C.D. Cal. 1995) (holding that the freezing of a Swiss bank account upon the request of the Department of Justice was a seizure within the meaning of the Fourth Amendment and could occur only if a warrant was obtained or probable cause existed); *Andrews v. Crump*, 984 F. Supp. 393, 410-11 (W.D.N.C. 1996) (holding that the filing of a tax lien was a Fourth Amendment seizure and that probable cause was the proper standard for determining its reasonableness).  Probable cause exists when there is "some

objective evidence which would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citations omitted). Here, Inspector Ceniga knew that (1) Mr. Hentz and inmate Ryan Williams had previously been sanctioned for racketeering, (2) inmate Williams had originally owed Mr. Hentz $2,000, (3) the racketeering sanction had cost Mr. Hentz $200 in fines, and (4) $2,200 had been deposited in Mr. Hentz's trust account from the account of a Ryan Williams. (Davies Aff. (#28) Attach. 2 at 7-8.) This is sufficient to establish probable cause to seize the funds as evidence of a crime.

Finally, whether the Fourth Amendment prohibits the temporary freezing of assets in a prisoner's trust account pending an investigation of whether the assets are contraband is, as demonstrated by the discussion above, at least unclear. Defendants are therefore entitled to summary judgment on these claims because they have qualified immunity. *See Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

## IV.    <u>Loss of Photographs</u>

Mr. Hentz contends that Officer Blackburn violated his First, Fourth, Fifth, and Fourteenth Amendment rights when he failed to properly inventory the photographs received from SRCI. (Compl. (#2) ¶ 6.A.8.)

### A.    *There is no First or Fourth Amendment violation*

It is unclear to this court how the loss of photographs could implicate the First Amendment. Mr. Hentz makes no attempt to explain this contention, therefore summary judgment is granted to defendants on this claim. Nor does Mr. Hentz allege that the photographs

were seized by defendants, rather he alleges that the photographs were lost and destroyed.  (Pl.'s

Mem. in Supp. of Summ. J. (#11) 7.)  This comports with the fact that the photographs were

inventoried because Mr. Hentz was transferred from SRCI to EOCI, not because they were seized

after a search of his cell.  (*See* Roe Aff. (#29) ¶ 4, Attach. 2 at 3.)  The loss of personal property

does not implicate the Fourth Amendment, therefore summary judgment is granted to defendants

on this claim.

> **B.**      ***There is no due process violation***

As discussed above, a claim for a violation of procedural due process requires both a

deprivation of a liberty or property interest and the denial of adequate procedural protections.

*Hufford*, 249 F.3d at 1150.  "[T]he word 'deprive' in the Due Process Clause connote[s] more

than a negligent act," *Daniels v. Williams*, 474 U.S. 327, 330 (1986), therefore "[w]here a

government official's act causing injury to life, liberty, or property is merely negligent, 'no

procedure for compensation is *constitutionally* required.'"  *Daniels*, 474 at 333 (quoting *Parratt

v. Taylor*, 451 U.S. 527, 548 (1981) (Powell, J., concurring)).

Mr. Hentz has not alleged that Officer Blackburn intentionally stole or lost the

photographs.  Rather, he has argued that Officer Blackburn negligently failed to follow ODOC

policies and procedures regarding the handling of inmate property.  (Pl.'s Mem. in Opp. (#41)

12.)  Officer Blackburn's negligence does not rise to the level of a constitutional deprivation of

property, therefore no constitutional due process was required after the loss of the photographs.[4]

---

[4] Even if the loss of the photographs was intentional, rather than negligent, the state has
provided adequate post-deprivation process by allowing Mr. Hentz to file a prison grievance and
a claim under the Oregon Tort Claims Act.  *See Parratt*, 451 U.S. at 543-44, *overruled on other
grounds by Daniels*, 474 U.S. 327.  In fact, Mr. Hentz filed a claim under the Oregon Tort
Claims Act and was offered $430.50 for the loss of the photographs, which he rejected.  (Hentz

*See Daniels*, 474 U.S. at 333.  Summary judgment is therefore granted to defendants on this claim.

V.    **Seizure of Property and Alleged Planting of Contraband & Retaliation**

Mr. Hentz makes the following claims with respect to the seizure of property from his cell and the alleged planting of contraband and retaliation by defendant Officer Roe: (1) Officer Roe violated his First, Fourth, Fifth, and Fourteenth Amendment rights by depriving Mr. Hentz of his personal property without due process of law (Compl. (#2) ¶ 6.A.9); (2) Officer Roe violated his Fifth, Eighth, and Fourteenth Amendment rights by planting contraband in his cell (*id.* ¶ 6.A.10); and (3) Officer Roe violated his Fifth, Eighth, and Fourteenth Amendment rights by retaliating against Mr. Hentz for using the grievance process against Officer Roe (*id.* ¶ 6.A.11).

A.    *There are no First Amendment violations*

Although Mr. Hentz does not actually allege a First Amendment violation as a result of the alleged retaliation, I examine the claim because defendants treat him as having alleged such a violation.  (*See* Defs.' Mem. in Supp. of Summ. J. (#24) 10-11.)  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote and citations omitted).

---

Aff. in Reply (#42) Ex. 7.)  This is all the constitution requires.

PAGE 22 - OPINION AND ORDER

The prisoner plaintiff must establish that the protected conduct was a substantial or motivating factor for the alleged retaliatory action. *See Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 285-87 (1977)). Although a retaliatory motive may be inferred from the timing and nature of the alleged retaliatory activities, *see id.* at 1315-16, a mere allegation of a retaliatory motive is insufficient to defeat a motion for summary judgment, *see Taylor v. List*, 880 F.2d 1040, 1045-46 (9th Cir. 1989) (finding conclusory allegations insufficient to establish that any individual prison official acted in retaliation for protected conduct). Additionally, a prisoner may base a retaliation claim on harms that do not raise due process concerns. *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997). Therefore, there is no need to demonstrate that the prisoner was deprived of a protected property or liberty interest.

Mr. Hentz has not presented any evidence that Officer Roe planted contraband in his cell in retaliation for the filing of a grievance. In fact, there is no evidence that he filed a grievance against Officer Roe on May 7, 2007. Such grievances are generally filed by the ODOC and should have been available to Mr. Hentz when he was filing this lawsuit, but it was not attached to Mr. Hentz's affidavits. The only evidence to which Mr. Hentz points to support his allegations are the two misconduct reports filed by Officer Roe. (*See* Hentz Aff. (#12) ¶ 8, Exs. 7, 9.) It is true that the first misconduct report does not list black pens among the items of contraband confiscated from Mr. Hentz's cell (*id.* Ex. 7) and the second report does list six black ink pens (*id.* Ex. 9). However, Hearing Officer Sturdevant dismissed the original charges without prejudice because some of the items of alleged contraband confiscated by Officer Roe were not included in the original misconduct report. (Sturdevant Aff. (#26) ¶ 10, Attach. 2 at 7.) Thus,

PAGE 23 - OPINION AND ORDER

this extra contraband was presented to the Hearing Officer *before* Mr. Hentz allegedly filed the grievance and before Officer Roe had any reason to retaliate against Mr. Hentz. These facts, even taken in the light most favorable to Mr. Hentz, are insufficient to establish that Officer Roe retaliated against Mr. Hentz by planting contraband in his cell. Thus, Mr. Hentz has failed to make a claim for retaliation and I grant summary judgment to defendants.

### B.    *There are no Fourth Amendment violations*

As stated above, the Supreme Court has held that "the Fourth Amendment has no applicability to a prison cell." *Hudson*, 468 U.S. at 536. A prisoner has no expectation of privacy in his or her cell. *Id.* at 526. Furthermore, "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.* at 528 n.8. Thus, Mr. Hentz has not made out a claim for an unreasonable search or seizure of his property and I grant summary judgment to defendants on these claims.

### C.    *There are no due process violations*

Even assuming that Mr. Hentz has a protected property interest in the items from his cell, defendants did not violate his due process rights because his disciplinary hearing complied with the requirements of *Wolff. See supra* Part III.B.2.b. Mr. Hentz was given notice of the charges on May 2, 2007. (Roe Aff. (#29) ¶ 9, Attach. 3 at 9; *see also* Sturdevant Aff. (#26) ¶ 8, Attach. 2 at 9.) A hearing was held on May 7, well over twenty-four hours later, at which the charges were dismissed without prejudice. (Sturdevant Aff. (#26) ¶ 9, Attach. 2 at 7.) A more detailed notice of charges was served on Mr. Hentz on May 8. (Roe Aff. (#29) ¶ 11, Attach. 3 at 12; Sturdevant Aff. (#26) ¶ 11, Attach. 2 at 14.) The second disciplinary hearing was held on May 14, well over twenty-four hours later. (Sturdevant Aff. (#26) ¶ 12, Attach. 2 at 10.) Mr. Hentz's request for a

witness was denied on proper grounds, that the witness's testimony would not have constituted a

defense. (*Id.*)  Hearing Officer Sturdevant made findings of fact and conclusions in writing that

were supported by facts in the record.[5]  (*Id.*)  The confiscation of the property therefore

comported with due process and I grant summary judgment to defendants on these claims.

## CONCLUSION

Based on the foregoing, Mr. Hentz's Motion for Summary Judgment (#9) is DENIED and

the defendants' Cross-Motion for Summary Judgment (#23) is GRANTED.

IT IS SO ORDERED.

Dated this  _3rd_  day of March, 2009.

_/s/ Michael W. Mosman_
MICHAEL W. MOSMAN
United States District Judge

---

[5] Mr. Hentz's claims all appear to be related to the May 7 and May 14 hearings.  If he is also attempting to make claims related to the April 4 hearing, those claims fail as well because the April 4 disciplinary hearing comported with the requirements of *Wolff*: (1) Mr. Hentz was given notice of the charges on April 2, (2) the hearing was held on April 4, more than twenty-four hours later, (3) Mr. Hentz chose not to call any witnesses, (4) Hearing Officer Sturdevant make findings of fact and conclusions in writing, and (5) those findings and conclusions were based on evidence in the record.  (Sturdevant Aff. (#26) ¶ 5, Attach. 2 at 2, 4.)